SOUTHWESTERN LIFE INS. CO. v. GREEN.

No. 8268.

Court of Civil Appeals of Texas. Austin.

Jan. 20, 1937.

Rehearing Denied Feb. 10, 1937.

Hamilton, Lipscomb & Wood, of Dallas, for appellant.

Roy Baskin, of Cameron, and A. H. Spann, of Navasota, for appellee.

BAUGH, Justice.

H. G. Green held an accident insurance policy in appellant company at the time of his death following an automobile accident, in which his wife, appellee here, was the beneficiary. The company denied liability, and appellee sued for the amount of the policy ($2,000), penalty, and attorney's fees. The case was submitted to a jury upon special issues which were answered in favor of appellee, and judgment entered accordingly; hence this appeal.

The policy contained the usual provisions for payment in case the "death of the insured shall result directly from bodily injuries effected exclusively and independent of all other causes through external and accidental means"; and excluded liability in case death should result "from any violation of law; . * * * or directly or indirectly, wholly or partly, from disease or mental infirmity." In addition to a general denial that deceased met his death within the provisions of the policy, the defendant pleaded that such death was caused wholly, or at least was contributed to, by bodily disease.

The findings of the jury in answer to the special issues Nos. 1 and 2 submitted were as follows:

That the death of the insured did not result (1) "directly or indirectly, wholly or partly, from disease," nor (2) "as the consequence of an accident occasioned by operating his automobile in excess of 45 miles per hour."

In answer to issue No. 3, they found that his death did result "directly from bodily injuries effected exclusively and independent of all other causes through external and violent accidental means."

The only contention made on this appeal is that there was no evidence to support these findings of the jury. The following material facts were shown relating to the death of Green: The deceased was found dying in his car on a state highway between Maysfield and Cameron, following an accident. Deceased was a drug salesman. On the afternoon of his death he entered a drugstore in Maysfield and asked for water with which to take a dose of Bisma-Rex, a preparation designed to give relief from gastric acidity, sour stomach, etc. At that time he was pale, in pain, and holding his hand over his heart. After taking this medicine he went to the back of the store and tried to vomit. He then returned to the drug clerk, secured and took a half teaspoonful of paregoric, and asked the clerk to telephone to a doctor in Cameron, to which place he was en route, to leave there immediately and meet him on the road, to give him a hypodermic, as he feared he could not reach Cameron without it. This was done, and Dr. Brooks started from Cameron for that purpose. Between Maysfield and Cameron, on a

graveled state highway, traveling alone in a Ford V–8 car, and driving at a speed estimated at from 60 to 70 miles per hour, he passed two witnesses. About 150 yards from where he passed these witnesses they heard a crash and both hurried to the scene. At this point the road was straight for a distance of some 500 yards behind him and some 200 or 300 yards ahead. The car had swerved gradually out of the highway into a ditch by the side of the road some 18 inches or 2 feet deep, the outside of which ditch was approximately perpendicular, had crossed the ditch, torn down a wire fence, broken off a green mesquite stump some 4 feet high and 3 or 4 inches in diameter, had run over underbrush and fence posts, and entered a cornfield, had run some 40 or 50 feet down the corn rows, then back through the fence, and stopped in the ditch alongside the road without turning over. There was no evidence of skidding in loose gravel, the rear wheels had not been thrown out of line, but had followed the tread of the front wheels in leaving the road. No serious damage, other than bending the front axle and the steering rods, appears to have been done to the car. When the witnesses arrived at the scene, insured was lying on his side in the front seat, or partly down in front of it, the gear shift lever had been pushed through his shirt front (whether by tearing the shirt or through an opening is not shown), there was a wound on his forehead about the size of a half dollar where the skin had been broken, and which was bleeding, he was unconscious, was gasping for breath, a gurgling sound was heard, and he died almost immediately. Only a few minutes thereafter, Dr. Brooks, who was on his way to meet the deceased, arrived at the place of the accident. From his own observations in the premises, and after being given the foregoing facts and circumstances, and after having obtained from deceased's wife and brother further information as to deceased's previous physical condition, Dr. Brooks testified that in his opinion death resulted from coronary occlusion—a disease of the heart. He also testified that in his opinion the wound found on deceased's head was not sufficient to cause death. On cross-examination, however, he testified that the blow or compact which caused the external wound on his head could have fractured his skull or caused his death. No X-rays were taken of deceased's head, and no post mortem examination of his heart was made.

No instructions were given or requested as to what would constitute a "disease" within the purview of the policy; nor as to the meaning or scope of the term "accidental." Nor do we find any evidence that prior to the accident the deceased's heart was in any manner "diseased," as that term, used in such policies, has been construed to mean. As stated in 18 C.J. 1139, such term implies "some ailment or disorder of somewhat established or settled character." A mere temporary condition, local in nature, which passes shortly, and after its passing the body again becomes normal, has been held not to constitute a "disease" as used in such policies. Mr. Justice Taft while Circuit Judge, in Manufacturers' Accident Ind. Co. v. Dorgan (C.C.A.) 58 F. 945, 955, 22 L.R.A. 620, cited with approval and followed in Robinson v. Ætna Life Ins. Co. (Tex.Com.App.) 276 S.W. 900, used the following language: "In a broad, generic sense, any temporary trouble by reason of which a man loses consciousness is a disease. It is a condition of the body not normal, and produced by the imperfect working of some function, but as the imperfect working is not permanent, and the body returns at once, or in a short period of time, to its normal condition, it does not rise to the dignity of a disease. A fainting spell produced by indigestion or a lack of proper food for a number of hours, or from any other cause which would not indicate any disease in the body, but would show a mere temporary disturbance or enfeeblement, would not come within the meaning of the words 'disease and bodily infirmity,' as used in this policy."

The exemption from liability in the policy involved in that case was fully as restrictive as the one involved in the instant case. The mere fact that the deceased was holding his hand over his heart when he was in the drugstore, under the circumstances, was not in itself evidence of any organic diseased condition of his heart. The jury had a right to conclude from the fact that he was taking medicine for a stomach disturbance that he merely had a stomach disorder caused by gas, indigestion, or an excess acid condition. The testimony of his wife indicated that such might have been his trouble when he was in the drugstore at Maysfield. Such stomach disturbances frequently cause what is commonly called "heartburn," whereas there may be no organic disability of the heart whatever. Absent any other proof

of a bad heart, and none was presented, it was clearly within their province to so conclude. And under the authorities above cited, it cannot be seriously contended that an attack of indigestion, common to people of good health, and which may be easily relieved, or pass in a short time, would constitute a "disease" within the meaning of the policy.

Under the factual circumstances, therefore, and reasonable inferences which the jury could properly draw from them, we think their answer to the first question has sufficient evidence to sustain it.

■■ A more serious question is presented, however, with reference to the finding that death did not result as a consequence of deceased's violation of the speed laws upon the state highway. The evidence negatived any mechanical defect of the car, or that its leaving the highway was due to loss of control or loose gravel. The car was not thrown out of line nor was there any evidence of skidding. The uncontradicted testimony of appellee's own witnesses was that immediately before the crash the car was traveling at from 60 to 70 miles per hour. This violation of the law having been shown, under the terms of the policy, the burden was upon the appellee to show that Green's death was not the result thereof. International Travelers' Ass'n v. Bettis, 120 Tex. 67, 35 S.W. (2d) 1040; Metropolitan Life Ins. Co. v. Funderburk (Tex.Civ.App.) 81 S.W.(2d) 132, 134. Even if it be assumed or conceded that deceased had a fainting spell or became temporarily unconscious, and that the injuries received were such as to cause his death, the very havoc wrought by the car after it left the paved portion of the highway, the indicated momentum which it had acquired, and the consequential violence which the deceased necessarily encountered as a result, almost conclusively show, we think, that there was a direct and proximate relationship existing between this excessive speed and the resultant injury. We find no evidence in the record indicating the contrary. If the external injury resulted in death, the injury obviously was attributable in large measure to the high rate of speed at which deceased was traveling. We find no evidence to the contrary. Under such circumstances we must conclude that this finding of the jury on this issue was without evidence to support it.

■ However, since it appears that the case has not been fully developed on the issues involved, and we are not prepared to say that all the evidence has been adduced which might be available, we think the ends of justice might be better subserved by reversing and remanding the cause, than by rendering judgment. The judgment of the trial court will therefore be reversed and the cause remanded.

Reversed and remanded.