## WESTERN RESERVE LIFE INS. CO. v. BURCHFIELD.

### No. 10905.

Court of Civil Appeals of Texas. San Antonio.

March 5, 1941.

Rehearing Denied March 26, 1941.

Kent & Brown, of Harlingen, for appellant.

Carter & Stiernberg, of Harlingen, for appellee.

MURRAY, Justice.

Appellee, Trixie Leola Burchfield, was beneficiary in a policy of life insurance written by appellant, Western Reserve Life Insurance Company, on the life of her husband, Leslie Earl Burchfield. The principal sum named was $2,000, with a provision for the payment of double indemnity, "if death shall result from bodily injuries caused directly, exclusively and independently of all other causes, by external, violent and accidental means."

Appellant paid appellee the principal sum of $2,000, but declined to pay the further sum of $2,000 as double indemnity, and appellee brought this suit seeking to recover that sum, together with the statutory penalty and attorney's fees. A jury trial was had and resulted in judgment for appellee in the total sum of $2,790, which included interest, penalties and attorney's fees. From this judgment the Insurance Company has prosecuted this appeal.

Appellant first contends that the evidence conclusively shows that Burchfield's death did not occur by accidental means within the provisions of the double indemnity rider attached to the insurance policy, that therefore appellant was entitled to an instructed verdict in its favor, and not having been given such a verdict was entitled to judgment notwithstanding the verdict (non obstante veredicto). We overrule this contention.

It is true that there was only one purported eyewitness to Burchfield's fall. This witness was a sixteen-year-old negro boy by the name of Ocie Jerome Woodson, who lived in Houston, Texas, but happened to be in Harlingen at the time of Burchfield's death. Woodson did not appear at the trial, but his testimony was taken by deposition. Appellee offered in evidence a portion of the cross-interrogatories and their answers, as follows:

"Q. Do you recall having made a sworn statement in the office of Carter & Stiernberg, Harlingen, Texas, on the 2nd day of November, 1939, about this case? A. I made a statement but I didn't swear.

"Q. Isn't it a fact that you made and swore to such a statement and that the statement you made was as follows:

" 'My name is Ocie J. Woodson. I live back of the Horn Apartments in Harlingen, Texas. About five or six weeks ago I was coming from the Unemployment office and was going west on Monroe Street from the Unemployment office and I saw a man, whom I later learned was Mr. Burchfield. He was going north when I first saw him, but he turned west, and went about to the fire escape and then turned to go to his truck and fell, and his head bumped against the pavement. He caught his stomach when he fell. When he fell he knocked a gash in his head and he seemed to be groaning from this gash. He fell pretty hard on his head. That is about all I know about his death.'

"A. I made that statement but I didn't swear to it.

"Q. Isn't it a fact that the statement you gave in the office of Carter & Stiernberg was carefully read over to you before you signed it and you stated that the statement was correct? A. I read it over. I said it was correct."

Whereupon appellant offered the rest of the deposition, to-wit:

"Q. What is your name and how old are you? A. My name is Ocie Jerome Woodson; I am sixteen years old.

"Q. Your home is at Houston, Texas? A. My home is in Houston, Texas.

"Q. Were you in Harlingen, Texas, in September of 1939? A. Yes, ma'am.

"Q. Do you remember seeing a man fall down on Monroe Street near the Arcadia Theater about September 6, 1939? A. Yes, Ma'am.

"Q. Had you ever seen this man before, or did you know his name? A. No, I had never seen him before.

"Q. Did you afterwards sign your name to a written statement made to Justice of the Peace Nance in connection with this matter? A. Yes, Ma'am.

"Q. Did you see this man before he fell down, and if so, what was he doing when you first saw him? A. Yes, I saw him before he fell down; he was walking toward his truck.

"Q. What, if anything, did you see him do just before he fell? A. He caught his stomach—put his hand right on his stomach.

"Q. Did you hear this man grunt or make any other sound? State what, if anything, you heard and whether it was before or after he fell, or both? A. Yes, I heard him grunt, sort of like he was going to heave up something. That was both before and after he fell.

"Cross-Interrogatories.

"Q. Has anyone talked to you about your testimony in this case in the last few days? A. Nobody but Judge A. M. Kent.

"Q. If you have stated that someone talked to you, then give his name and tell me who he represented himself to be, and tell me what, in substance, he has told you about this case. A. Judge Kent said he was a judge of Brownsville and Harlingen. He asked me something about it. He didn't tell me anything about it. Just said they wanted to know did I tell another man the same thing I told him.

"Q. Have you been paid anything for giving this deposition, and if so, how much? A. No.

"Q. Have you been promised any sum of money for giving this deposition? A. They said I might get something. That was the lawyer in Harlingen, I don't know his name but his office is in the Baxter Building.

"Q. Has anyone talked to you today about what your testimony should be in this case? A. No, ma'am.

"Q. Has anyone suggested to you today anything about the facts in this case? A. No, ma'am.

"Q. Isn't it a fact that on this occasion you were walking down the street and paying very little attention to what was ahead of you when this man fell on the pavement? A. Yes, ma'am.

"Q. Isn't it also a fact that the deceased, Mr. Burchfield, never groaned until after his head hit the pavement? A. He do like that before and after he fell too—before and after.

"Q. Isn't it a fact that you saw him trip and stumble off of the curb at the edge of the pavement just before he fell? A. No, I don't think he did.

"Q. Isn't it a fact that when he tripped and stumbled he fell forward suddenly in such a manner that his head—above the eyes and nose—was the first part of his body to strike the ground, and that after it struck the ground he began to groan? A. He didn't trip.

"Q. Isn't it a fact that his head seemed to hit the concrete or street with great force and with such force that you could hear the crack or noise from where you were standing? A. No.

"Q. Isn't it a fact that Mr. Burchfield was bleeding and his head was practically covered with blood when you got to him? A. He was bleeding. One side of his face was covered with blood. Some men turned him over and tried to put his head in his cap to keep it from laying on the cement.

"Q. Isn't it a fact that he was walking perfectly normal and close to the curb just before he fell? A. I don't know whether he walked like he always did or not. I just saw him come around in front of the Arcadia and turn just before he fell.

"Q. Isn't it a fact that you were very badly frightened and thought you were under suspicion immediately after you found out this man was dead and all during the time you were being questioned by officers

in the office of justice of the peace? A. I was frightened a little; it was the first time I ever saw anybody fall dead. When I first seen him fall I went and called two men. I wasn't frightened when I was being questioned by the Justice of the Peace.

"Q. State who is present while you are giving this deposition. A. The notary public, the lady who is taking my answers. Mr. Kent is in the other room, but not in the room where I am.

"Mr. Brown: I think it is understood and agreed between counsel that the Mr. Kent referred to by the witness in his answer was not Judge Kent, but was his son who lives in Houston or Bayview, and his initials are J. B. Kent.

"It is agreed that the office of counsel for the plaintiff is in the Baxter Building in Harlingen, and that neither Mr. Kent nor Mr. Brown have offices in the Baxter Building."

Woodson admitted that on the occasion in question he was walking down the street and paying very little attention to what was ahead of him when Burchfield fell to the pavement, that he was frightened a little, and that he made a written statement on November 2, 1939, some two months after the accident (which was at variance with his deposition taken some four months later). These admissions, when taken in connection with all the other facts and circumstance in the case, would justify reasonable minds in differing as to just what caused Burchfield to fall. Thus the matter was properly submitted to the jury whose duty it was to draw the inference from all the evidence as to what caused Burchfield to fall.

The evidence is overwhelming that Burchfield received a severe gash on his head when it struck the pavement, and that this blow on his head caused his death. Even if it be conceded that one of Burchfield's hands was placed in the region of his stomach and that he grunted as though he was going to heave up something as he was falling, this would not conclusively establish that he was suffering from an internal sickness and that the same caused him to fall. The evidence also shows that he fell as he left the uneven edge of the sidewalk and attempted to alight on the street pavement. He was also shown to be a well man, capable of loading a 500-pound bale of cotton on his truck. The jury found that external, violent and accidental means, exclusively and independently of all other causes, were the proximate cause of the injury sustained by Leslie Earl Burchfield in striking his head on the pavement on the occasion of his fall on the date in question, and that such injury was the sole cause of his death. Such findings are reasonable deductions from all the evidence. The trial court properly overruled appellant's motion for an instructed verdict and its motion for judgment notwithstanding the verdict (non obstante veredicto).

In making the above holding we are assuming without deciding that the expression "if death shall result from bodily injuries caused directly, exclusively and independently of all other causes, by external, violent and accidental means," when applied to the facts herein, should be construed to mean that if Burchfield was caused to fall even in part by internal or natural causes, then and in such event the company would not be liable, and further that the burden of proof would be on appellee to establish by a preponderance of the evidence that such fall was not caused even in part by natural causes or internal pains.

Appellant next complains because of alleged improper argument made by counsel for appellee during the closing argument to the jury. The record discloses that this argument was counsel's deductions drawn from facts in evidence and made in reply to an argument made by counsel for appellant. The court did not err in refusing to instruct the jury not to consider the argument.

Appellant next complains because a recovery for damages and attorney's fees was allowed. Appellant paid the principal sum of $2,000, stated in the face of the policy, but declined to pay twice that amount under the double indemnity rider attached to the policy. The damages and attorney's fees were allowed for the suit to collect the extra $2,000, alleged to be due under the double indemnity rider. Appellant contends that Art. 4736, Vernon's Annotated Civil Statutes, when given a strict construction would not allow damages and attorney's fees on the amount due under the double indemnity features of the policy. We overrule this contention. There is no reason why Art. 4736 should not be applied to the double indemnity features of the contract of insurance. Such provisions are as much a part of the insurance policy as any of its other provi-

sions. Washington Fidelity Nat. Ins. Co. v. Williams, Tex.Com.App., 49 S.W.2d 1093; Dorsey v. Fidelity Union Casualty Co., Tex.Civ.App., 52 S.W.2d 775; Ætna Life Ins. Co. v. Robinson, Tex.Civ.App., 262 S.W. 118; Robinson v. Ætna Life Ins. Co., Tex.Com.App., 276 S.W. 900. See, also, Southwestern Life Ins. Co. v. Green, Tex.Civ.App., 101 S.W.2d 594; Seaboard Life Ins. Co. v. Murphy, 134 Tex. 165, 132 S.W.2d 393.

The judgment is affirmed.